NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

STEVEN CARROLL DEMOCKER, *Appellant*.

No. 1 CA-CR 14-0137
FILED 10-11-2016

Appeal from the Superior Court in Yavapai County
No. P1300CR2010-01325
The Honorable Gary E. Donahoe, Judge *Retired*

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By David A. Simpson
*Counsel for Appellee*

David Goldberg, Attorney at Law, Fort Collins, CO
By David Goldberg
*Counsel for Appellant*

_____

**MEMORANDUM DECISION**

Presiding Judge Kent E. Cattani delivered the decision of the Court, in which Judge Samuel A. Thumma and Judge Randall M. Howe joined.

_____

**C A T T A N I, Judge**:

¶1　　　　Steven Carroll DeMocker appeals his convictions and sentences for first-degree murder, burglary, fraud, and related charges for manufacturing fictitious evidence.  For reasons that follow, we affirm.

**FACTS AND PROCEDURAL BACKGROUND[1]**

¶2　　　　Circumstantial evidence presented at trial established that DeMocker killed his ex-wife in her Prescott residence on July 2, 2008.  DeMocker and the victim were married in 1982 and had two daughters together.  The couple separated in 2002 or 2003 and divorced on May 28, 2008.

¶3　　　　At the time of the murder, DeMocker was experiencing financial difficulties.  He had approximately $30,000 in monthly expenses, including a $6,000 spousal support payment, and less than $13,000 in average net monthly income.  He had spent money from retirement accounts, taken out lines of credit on both of his homes, used credit cards extensively and borrowed money from his parents.

¶4　　　　In the months before and after the divorce, DeMocker sent the victim several messages expressing his frustration with her and with his financial condition.  A message sent on June 2, 2008 stated, "It's a little exasperating to have settled on an agreement that provides for you as well as it does and to be facing eight years of writing very large checks on the 1st of every month on top of spending more years than that paying off the debt we have now left to me, only to have you continue to berate me as though you have been mistreated."  And a message sent on June 14, 2008 stated, "I will not be pushed any further . . . .  You have extracted all you will extract from me.  I am in such incredibly worse financial condition than you are and will be for many years to come.  You get to start clean while I dig out

_____

[1]　　　On appeal, this court views the evidence in the light most favorable to sustaining the conviction and resolves all reasonable inferences against defendant.  *State v. Karr*, 221 Ariz. 319, 320, ¶ 2 (App. 2008).

of a staggering hole while I'm trying to pay out $400,000 in after-tax dollars to send our girls to college. My income has dropped by almost half. My [financial advisor] practice is in pieces. And you got a settlement based on what is likely to be the biggest year of my career."

¶5 Approximately one month before the murder, DeMocker used his laptop to search the internet for information regarding "payment of life insurance benefits in the case of a homicide," "tips from a hitman on how to kill someone," "how to stage a suicide," "how to kill and make it look like suicide," and "how to make a homicide appear suicide." The laptop had a privacy setting that automatically deleted internet search histories, but after the murder, investigators were able to recover portions of the search history.

¶6 At 7:36 p.m. on the day of the murder, the victim called her mother from her home phone. They discussed her divorce, and the victim indicated she was worried because DeMocker had not made his monthly spousal-maintenance payment, and she told her mother she was going to call her lawyer about it the next day. A few moments later, the victim said "Oh, no," as if she were surprised and dismayed by something, and the phone went dead.

¶7 The victim's mother tried unsuccessfully to call her back, then called the Yavapai County Sheriff's Office. A deputy went to the victim's house and saw her through a window lying face-down on the floor. Deputies later entered the home and initially thought the victim had fallen from a ladder and hit her head because there were no signs of forced entry, and a bookcase and ladder had tipped over as if she had fallen. But on closer examination, the deputies began to suspect the scene had been staged; blood stains on the carpet indicated the victim was moved after she began bleeding, and the ladder did not have blood on it, suggesting it had been positioned after she was killed. The Yavapai County Chief Medical Examiner conducted an autopsy and concluded that the victim's cause of death was multiple blunt-force head injuries from a round object shaped like the head of a golf club.

¶8 Between 5:00 and 5:30 p.m. the night of the murder, DeMocker told his daughter he was going on a mountain-bike ride. He subsequently claimed that he arrived at a trailhead at 6:00 or 6:30 p.m., planning to ride for two to two and a half hours, even though his purported route would have kept him on the trail well after sunset. At 9:40 p.m., his daughter tried to call his cell phone and got no answer, which was unusual because he generally took his cell phone with him everywhere he went. Cell phone records later confirmed that DeMocker's phone was powered

off from 5:36 p.m., to 10:05 p.m.—the time-period during which the victim was killed.

¶9            After leaving DeMocker a message, his daughter and her boyfriend went to the grocery store.  When they returned to DeMocker's residence, he was in the shower and his clothes were in the washing machine.  When he got out of the shower, he told his daughter he was late because of a flat tire on his bike.  He seemed unusually tense and restless, and his arms and legs had fresh cuts and scratches.

¶10          Deputies searched DeMocker's residence and took photographs, which they later noticed showed a set of golf clubs with one empty golf club cover for a Callaway brand driver.  The deputies subsequently searched the residence again but did not find the empty club cover.

¶11          After the deputies left, DeMocker told his family he had found the cover in his girlfriend's car, and he suggested it could have "blown in the car from the wind."  DeMocker gave the club cover to his attorney, who provided it to sheriff's investigators after they obtained a warrant to search his office.  Sales records indicated DeMocker had purchased a specially ordered Callaway driver with a matching cover in 2003, but the club was missing.

¶12          Shortly after the murder, deputies searched the area around the victim's house and found freshly-made footprints that did not match her shoes but were consistent with the treads on shoes DeMocker wore and that were of a shoe model that only sold about 8,900 pairs nationwide.

¶13          Investigators also learned that DeMocker purchased a motorcycle in July or August 2008, and in August 2008, he had four books shipped to his office containing information about "how to change your identity" and "how to disappear."  DeMocker asked his daughter to buy him a GPS navigation unit, several hydration packs, and multiple "pay-as-you-go" cell phones.  There was a motorcycle in the garage of DeMocker's Scottsdale residence with maps, a GPS device, and $15,000 in cash inside the motorcycle's saddlebags.

¶14          After DeMocker was arrested, he asked his youngest daughter to visit him in jail and to bring a pen and paper.  When she arrived, DeMocker told her that someone in jail had told him how the victim died, and DeMocker told his daughter to write down verbatim a story detailing that two men and a woman were sent to kill the victim and a man who lived in her guest house because of a prescription drug deal

involving the man in the guest house. DeMocker told his daughter to anonymously email the story to his defense attorney and to the prosecutor because "it would be more credible coming from someone else," and because he thought his attorney would not believe that somebody in the jail had told him the story.

¶15 Investigators subsequently interviewed DeMocker about the email, and he told them he did not know about it. He claimed, however, to have heard a similar account of the murder through an air vent in his cell.

¶16 In July 2010, during DeMocker's first trial on charges of premeditated murder and burglary, the Yavapai County Attorney's Office ("YCAO") learned that the victim's life insurance proceeds had been used to pay DeMocker's attorneys, even though the insurance company had distributed the policy proceeds to the victim's trust on the condition that DeMocker disclaim any interest in them, and in violation of the terms of the trust. YCAO also learned that DeMocker had manufactured the anonymous email blaming third parties for the murder and had persuaded his daughter to send it to YCAO and to DeMocker's attorney, who had successfully argued for its admission in evidence on the basis that it contained information that could only have come from someone familiar with the crime and was thus exculpatory. YCAO thereafter filed a bar complaint against defense counsel based on counsel's alleged involvement with the distribution of the life insurance proceeds, and subsequently filed fraud charges against DeMocker relating to his fabrication and use of the anonymous email, and his fabrication of the "voice in the vent" statement.

¶17 Defense counsel filed motions seeking dismissal with prejudice and/or disqualification of YCAO for interfering with DeMocker's right to counsel, in part because of the YCAO bar complaint and the bar complaint filed by the Yavapai County Sheriff's Office against defense counsel. Addressing issues relating to the payment of counsel using insurance proceeds, the superior court held that the State would be permitted to introduce evidence "as to the ultimate disposition of the insurance proceeds," but that the State would not be permitted to call DeMocker's counsel as witnesses or offer evidence or argument that the distribution from the trust to counsel was unlawful.

¶18 Following the denial of DeMocker's motions to dismiss, defense counsel moved to withdraw and for a mistrial, arguing they could not continue to represent DeMocker because of the accusations against them relating to the insurance proceeds, and because of their involvement in seeking to admit the anonymously-sent email evidence. The court denied the motions to withdraw, but on review to the Arizona Supreme

Court, the lawyers were permitted to withdraw because "the client ha[d] used the lawyer[s'] services to perpetrate a crime or fraud." Newly appointed defense counsel then successfully moved for a mistrial on the basis that they could not be prepared in time to go forward with the trial in front of the impaneled jury.

¶19 The grand jury then indicted DeMocker on consolidated charges of first-degree murder, burglary, a scheme to defraud the victim's testamentary trust, fraud, and other charges relating to the fabricated anonymous email and fictitious report of a "voice in the vent." The court dismissed the previously-filed murder and burglary case.

¶20 Before the second trial began, DeMocker moved to dismiss the charges based on alleged prosecutorial misconduct, or alternatively, to disqualify YCAO, asserting that "the state illegally viewed and printed sealed ex parte pleadings." The documents in question generally related to DeMocker's requests for money to have experts for the first trial, and were apparently made available through administrative inadvertence on the part of the superior court. After conducting an evidentiary hearing, the court issued a 57-page minute entry denying the motion, finding that although the State acknowledged its employees viewed and/or printed the documents, DeMocker had not established any resulting prejudice. DeMocker sought special action relief challenging the ruling, and this court accepted jurisdiction but denied relief.

¶21 DeMocker also filed a motion to sever the trial on the murder and burglary charges from trial on the fraud charges, but the court denied the motion. At the close of the State's case, the court granted judgment of acquittal on the count alleging forgery of the anonymous email, and, with the agreement of the parties, dismissed with prejudice the fraud/forgery charges relating to the "voice in the vent" statement and the anonymous email. The jury convicted DeMocker of the remaining counts, including first-degree murder, first-degree burglary, fraudulent schemes and artifices (obtaining money from the testamentary trust), fraudulent schemes and artifices (creating the anonymous email and "voice in the vent" stories), conspiracy to commit fraudulent schemes, tampering with physical evidence, and contributing to the delinquency of a minor (all relating to the anonymous email).

¶22 Before sentencing, DeMocker filed a motion for new trial, arguing that the convictions were contrary to law and against the weight of the evidence. DeMocker later supplemented the motion, arguing that a Yavapai County Jail commander had improperly questioned him after the

verdict without his counsel present, thereby violating his right to counsel. After hearing argument, the court denied the motion.

**¶23**     The court sentenced DeMocker to natural life on the murder conviction and to an additional 10 years total on the remaining counts, and ordered restitution of $700,000 to be paid to the victim's testamentary trust. DeMocker timely appealed.

## DISCUSSION

### I.     Motion to Suppress.

**¶24**     DeMocker argues that the superior court abused its discretion by denying his motion to suppress evidence seized from his house, office, and vehicle the day after the murder.   He asserts that the affidavit supporting the search warrant allegedly contained false statements and had no statement showing probable cause to believe that these locations contained evidence relevant to the murder.   But the detective who obtained the warrant testified regarding the affidavit at a hearing conducted pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), and the superior court found that the affidavit had no "significant substantive misstatements . . . based on the information known to the affiant," and that officers relied on the warrant in good faith.

**¶25**     Under *Franks*, "[a] trial court must suppress evidence seized pursuant to a warrant if a defendant proves, by a preponderance of the evidence, that the affiant knowingly, intentionally, or with reckless disregard for the truth made a false statement to obtain the warrant *and* that the false statement was necessary to a finding of probable cause."   *State v. Nordstrom*, 200 Ariz. 229, 245, ¶ 42 (2001), *abrogated on other grounds by State v. Ferrero*, 229 Ariz. 239 (2012).   Innocent or negligent errors in an affidavit will not satisfy the first prong of the *Franks* test; proof is required that the affiant did not believe, or entertained serious doubts about, the truth of the avowals.   *State v. Carter*, 145 Ariz. 101, 109 (1985); *see also State v. Poland*, 132 Ariz. 269, 279 (1982) ("serious doubts" can be shown by "obvious reasons to doubt the veracity of the informant or the accuracy of his reports").

**¶26**     Our review on appeal is limited to the evidence considered by the superior court at the suppression hearing, *State v. Blackmore*, 186 Ariz. 630, 631 (1996*),* and we view the evidence in the light most favorable to sustaining the superior court's ruling.   *State v. Hyde*, 186 Ariz. 252, 265 (1996*).*   "A trial court's finding on whether the affiant deliberately included misstatements of law or excluded material facts is a factual determination, upheld unless clearly erroneous."   *State v. Buccini*, 167 Ariz. 550, 554 (1991)

(citations and internal quotation marks omitted). But the superior court's finding as to whether a redrafted search warrant affidavit is sufficient to establish probable cause is reviewed de novo. *See id.* at 555.

¶27 DeMocker's *Franks* claim fails because the evidence at the hearing did not show either that the detective who provided the affidavit doubted the truth of the purported misstatements, or that the misstatements were necessary to the finding of probable cause. DeMocker argues the affidavit (1) incorrectly described the private bike trail behind the victim's residence as being a public trail; (2) indicated that DeMocker had yet to transfer $190,000 to his ex-wife, when in fact the transfer had already occurred; (3) misstated when DeMocker left for his bike ride and the duration of the ride, making it appear hours longer than it was; (4) misquoted DeMocker's daughter and her boyfriend as saying that after DeMocker returned from his bike ride, he did not eat as much as usual; (5) misrepresented where DeMocker said he parked his car and rode his bike, suggesting that he was riding nearer to the victim's house than his actual route; and (6) compounded the misrepresentation by indicating that he had not found any tracks that supported DeMocker's claims.

¶28 The detective testified that he relied on what he had heard directly or had been told by another law enforcement officer, and that he believed these statements were true at the time he signed the affidavit. Based on that testimony, the superior court did not abuse its discretion by concluding that DeMocker did not satisfy the first *Franks* factor. Moreover, the challenged statements were not essential to establish probable cause; the central undisputed facts remained that DeMocker was on a solitary hours-long mountain-bike ride the night of the murder, fresh bike tracks were discovered on a trail near the victim's residence, DeMocker had fresh scratches and abrasions that night, and he went to his office after returning from the bike ride. Additionally, DeMocker had recently been involved in a lengthy divorce that resulted in him paying the victim $190,000. Thus, the record supports the judge's finding that there were no "significant substantive misstatements in the affidavit based on the information known to the affiant," and there was sufficient probable cause to search DeMocker's residence, office, and car for blood, weapons, clothes, computer and phone records, and other items of evidentiary value.

## II. Double Jeopardy.

¶29 DeMocker argues that the second prosecution for murder and burglary after the mistrial violated his rights to protection against double jeopardy, counsel of choice, and due process, asserting that retrial was barred because the State intentionally engaged in misconduct that caused

the mistrial. We review a court's denial of a motion to dismiss for abuse of discretion, but we examine de novo a claim that retrial is barred by double jeopardy. *State v. Moody*, 208 Ariz. 424, 437, 448, ¶¶ 18, 75 (2004).

¶30 Under the federal constitution, the circumstances under which a defendant may invoke the double jeopardy bar "are limited to those cases in which the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial." *Oregon v. Kennedy*, 456 U.S. 667, 679 (1982) (plurality opinion). The Arizona Constitution's double jeopardy provision bars a retrial when the mistrial is caused by "intentional conduct which the prosecutor knows to be improper and prejudicial, and which he pursues for any improper purpose with indifference to a significant resulting danger of mistrial or reversal." *Pool v. Superior Court*, 139 Ariz. 98, 108–09 (1984).

¶31 The record does not support DeMocker's double jeopardy claim; it was DeMocker's conduct in fabricating the anonymous email, not any alleged misconduct by the prosecutor, that prompted the Arizona Supreme Court to allow counsel to withdraw. The subsequent mistrial was requested by new defense counsel, and was granted because of new counsel's inability to go forward with trial before the same jury.[2]

¶32 The record similarly does not support DeMocker's claim that the State intentionally attempted to create a conflict of interest or otherwise engaged in prosecutorial misconduct. In superior court, DeMocker asserted misconduct by the prosecutor for (1) opening a criminal investigation into the victim's life insurance benefits in the middle of the first trial, (2) filing charges relating to DeMocker's fabrication of evidence, (3) seeking to introduce evidence at the first trial that the victim's life insurance benefits were used to pay DeMocker's attorneys' fees, (4) identifying defense counsel as a witness on those issues, (5) seeking to introduce evidence at the first trial that DeMocker fabricated the anonymous email, (6) filing additional charges against DeMocker during the first trial arising from his fabrication of the "voice in the vent" statement and the anonymous email, and (7) filing bar complaints against defense counsel relating to their involvement in those issues. But the record shows that the State discovered this evidence midtrial and reacted by charging

---

[2] The record does not support DeMocker's claim that the State conceded its conduct had created a conflict of interest that caused the mistrial; the prosecutor simply indicated he had no objection to defense counsel seeking a mistrial, and deferred until a later date any response to a motion to dismiss with prejudice that defense counsel might file.

(within days of its discovery that DeMocker had fabricated evidence) additional crimes related to that evidence. DeMocker's conduct created a conflict for his own attorneys, and the prosecutor repeatedly avowed that the State was not seeking to cause a mistrial by filing bar complaints, but rather was attempting to fulfill its ethical obligation to ensure that DeMocker had a fair trial with conflict-free counsel.

**¶33** The superior court was in the best position to ascertain whether the prosecutor acted in bad faith, and after summarily denying DeMocker's first motion to dismiss, the court denied the second motion, expressly finding that the prosecutor did not intentionally seek a mistrial. The superior court's view of the prosecutor's motives and credibility is entitled to deference, *see State v. Martinez*, 230 Ariz. 208, 215, ¶¶ 30–31 (2012), and the court did not abuse its discretion by denying DeMocker's motions to dismiss.[3] And because DeMocker's prosecutorial misconduct claim is unavailing, his double jeopardy claim premised on that alleged misconduct likewise fails.

### III. Severance.

**¶34** DeMocker argues that the superior court abused its discretion by denying severance of the murder and burglary charges from the other charges. He asserts that the conduct giving rise to the other charges was irrelevant to the murder, was not admissible under Arizona Rule of Evidence 404(b), and was highly prejudicial. But the superior court properly found that evidence of the other charges would be admissible in the murder trial, and that accordingly, DeMocker would not be prejudiced by a consolidated trial.

**¶35** We review a ruling on a motion to sever for an abuse of discretion. *See State v. Prince*, 204 Ariz. 156, 159, ¶ 13 (2003). The court must grant a motion to sever charges if "necessary to promote a fair determination of the guilt or innocence of any defendant of any offense." Ariz. R. Crim. Pro. 13.4(a). "In deciding whether to grant a severance the court must balance the possible prejudice to the defendant against interests of judicial economy." *State v. Cruz*, 137 Ariz. 541, 544 (1983) (citations omitted). "When a defendant challenges a denial of severance on appeal, he must demonstrate compelling prejudice against which the trial court was

---

3 DeMocker's summary listing of other alleged instances of prosecutorial misconduct is insufficient for appellate review. *See Moody*, 208 Ariz. at 452 n.9, ¶ 101 (failure to present "significant arguments, supported by authority" in opening brief waives issue).

unable to protect." *Prince*, 204 Ariz. at 159, ¶ 13 (citation and internal quotation marks omitted).

¶36      DeMocker has not established that the court abused its discretion by denying the requested severance. Rule 13.3(a)(2) of the Arizona Rules of Criminal Procedure provides that joinder is permissible if the offenses "[a]re based on the same conduct or are otherwise connected together in their commission." Offenses are "otherwise connected together in their commission" when "evidence of the two crimes was so intertwined and related that much the same evidence was relevant to and would prove both, and the crimes themselves arose out of a series of connected acts." *State v. Prion*, 203 Ariz. 157, 162, ¶ 32 (2002).

¶37      DeMocker's fabrications of the detailed anonymous email and the similar "voice in the vent" statement were relevant because they demonstrated DeMocker's knowledge of the facts and circumstances of the murder, as acknowledged by defense counsel in initially seeking to admit the email in evidence. Thus, evidence of the fabrications related to the murder and burglary charges, and did not necessitate severance.

¶38      The fact that DeMocker obtained the benefit of the life insurance proceeds was significant circumstantial evidence of his intent and motive to murder the victim. A month before the murder, DeMocker conducted a computer search on payment of life insurance in the event of a homicide, and two months after the murder, DeMocker filed a claim for life insurance benefits.[4] Even after he formally disclaimed any interest in the benefits, DeMocker attempted to assert control over them, telling his daughter that he had "been paying the payments for a long time and he had plans for that money and this came up, and now we need it for my defense." Although the victim had set up a trust to receive life insurance benefits to benefit her daughters, DeMocker obtained the insurance proceeds through a series of bank transfers that culminated in payment of $700,000 to his original attorneys for defending him on the murder charge.

¶39      Under these circumstances, evidence that DeMocker ultimately obtained the benefit of the victim's life insurance proceeds would have been admissible in a separate murder trial to demonstrate premeditation. *See State v. Mincey*, 130 Ariz. 389, 406 (1981) ("[I]n resolving the issue of premeditation and deliberation [in a first degree murder case] the jury is authorized to take into consideration the conduct of the

---

[4]      The record does not support DeMocker's argument that it was undisputed that because of the divorce, he had no right to the proceeds of the victim's life insurance.

defendant, both before and after, as well as at the time of the homicide, and all attending circumstances.") (citation omitted). Similarly, evidence that DeMocker murdered the victim would have been admissible in a separate trial on the charge alleging that he defrauded the trust, because it was relevant to the series of misrepresentations he made to obtain the funds to pay his attorneys.

**¶40**     Because the evidence would have been cross-admissible in separate trials, DeMocker has not shown the prejudice necessary for reversal. Moreover, a denial of severance does not generally prejudice a defendant when the jury is instructed to consider each offense separately and is advised that each offense must be proven beyond a reasonable doubt. *See State v. Hausner*, 230 Ariz. 60, 75, ¶ 48 (2012). Here, the court instructed the jury to that effect, and severance was not necessary to fairly determine DeMocker's guilt or innocence on any of the charges. Thus, the court did not abuse its discretion by denying DeMocker's severance request.

## IV.     Admission of Other-Act Evidence.

**¶41**     DeMocker argues that the superior court abused its discretion by admitting unfairly prejudicial other-act evidence that he (1) had simultaneous extramarital affairs with three women, (2) conducted computer searches involving staged homicides before the murder, (3) exchanged emails and texts with the victim for a year arguing over their finances and the pending divorce settlement, and (4) made plans to flee before his arrest.

**¶42**     Under Rule 404(b), evidence of other crimes, wrongs, or acts is generally inadmissible "to prove the character of a person in order to show action in conformity therewith," but may be admitted for other purposes, such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evidence otherwise admissible under Rule 404(b) may be excluded under Rule 403 if its probative value is substantially outweighed by the danger of unfair prejudice. "Evidence is unfairly prejudicial if it has an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *State v. Mills*, 196 Ariz. 269, 275, ¶ 28 (App. 1999) (citation and internal quotation marks omitted).

**¶43**     We ordinarily review the superior court's decision to admit evidence under Rule 404(b) for an abuse of discretion. *State v. Forde*, 233 Ariz. 543, 558–59, ¶ 42 (2014). But because DeMocker expressly withdrew his Rule 404(b) objection to evidence of his extramarital affairs with two witnesses before the first trial, and did not argue that his exchange of emails

and texts with the victim should be excluded under Rule 404(b), we review these claims for fundamental error only. *See State v. Henderson*, 210 Ariz. 561, 567, ¶ 19 (2005).

¶44 The court did not err, much less fundamentally err, by allowing two witnesses to testify regarding extramarital affairs with DeMocker. The witnesses testified regarding a variety of issues, and DeMocker conceded that their testimony regarding extramarital affairs was relevant to properly evaluate the basis of their knowledge, motivation, and credibility. Thus, the testimony was not unfairly prejudicial. Nor did the court fundamentally err by admitting a brief reference by one of these witnesses to DeMocker's affair with a third woman, given the cumulative nature of such evidence and because it was relevant to the witness's credibility regarding why she considered ending her relationship with DeMocker.

¶45 Nor did the court err by admitting evidence of texts and emails between DeMocker and the victim arguing over finances in the year before the murder. This evidence was probative of DeMocker's motive for the murder and his premeditation, and was not unfairly prejudicial. *See State v. Hyde*, 186 Ariz. 252, 276–77 (1996) (holding that evidence that the defendant had been in arrears for several months in his child support obligations was properly admitted to establish a financial motive for murders); *State v. Jeffers*, 135 Ariz. 404, 418 (1983) ("We have long held that where the existence of premeditation is in issue, evidence of previous quarrels or difficulties between the accused and the victim is admissible.").

¶46 Likewise, the court did not abuse its discretion by admitting evidence that (1) before the murder, DeMocker had conducted computer searches on staged homicides and on payment of life insurance proceeds in the event of a homicide, and (2) he had made plans to flee, including ordering books on how to hide an identity, obtaining a replacement passport (after his was seized on execution of a search warrant), and equipping a motorcycle with camping gear, a significant amount of cash, and a GPS map of Mexico. The computer searches were probative of intent and premeditation, and the evidence was not unfairly prejudicial; any explanation that DeMocker allegedly conducted the computer searches for research on a book he wanted to write or his reasons for planning to flee went to the weight of the evidence, not its admissibility. *See Jeffers*, 135 Ariz. at 415 (evidence of attempted escape from jail was relevant to show consciousness of guilt, even though there may have been other explanations for the attempted escape).

## V.     Denial of Motions to Preclude Shoe-Print and Bike-Tire-Track Experts.

¶47       DeMocker argues that the court abused its discretion under Arizona Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), by denying his motions to preclude evidence and thereafter admitting "unscientific" expert opinion testimony on comparison of shoe prints and bicycle-tire tracks.[5]  We review the superior court's decision to admit expert testimony for an abuse of discretion.  *State v. Boyston*, 231 Ariz. 539, 544, ¶ 14 (2013).

¶48       DeMocker argues that the experts' testimony that the impressions near the crime scene were similar to the pattern on DeMocker's bike tires and the soles of shoes he had purchased two years earlier was not helpful to assist the jury under Rule 702(a).  DeMocker also asserts that the photographs of the impressions that the experts used to make comparisons did not have sufficient detail and were thus inadmissible under Rule 702(b), and that the methods the experts used were unreliable because they were purely subjective and therefore failed to satisfy Rule 702(c) and (d).

¶49       After conducting a pretrial evidentiary hearing, the superior court concluded that expert testimony by DPS examiner John Hoang on tire tracks and by FBI forensic examiner Erik Gilkerson on shoe-print comparison was admissible.  The court found that "there is a base level of scientific theory and practical effect in comparing one item to another"; "the principles and methods are appropriate"; and "the principles and methods" were sufficiently reliable to allow application of the described methodology to particular facts to be replicated or contested by other scientists.

¶50       A witness who is "qualified as an expert by knowledge, skill, experience, training, or education" may offer opinion testimony if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Ariz. R. Evid. 702.  In Arizona, shoe-print comparisons have been deemed "quite beyond common experience," and a proper subject on which expert testimony can

---

[5]       The court applied *Daubert* in resolving the issue.  The experts testified after the effective date of revised Rule 702 (January 1, 2012), and accordingly the *Daubert*-type standard applied to this testimony.  *State v. Perez*, 233 Ariz. 38, 42, ¶ 16 (App. 2013).

assist the jury. *State v. Runningeagle*, 176 Ariz. 59, 69 (1993). Moreover, federal courts applying the *Daubert* standard have long admitted this type of testimony. *See United States v. Smith*, 697 F.3d 625, 634–35 (7th Cir. 2012) (and cases cited therein). The same reasoning applies to expert testimony on bike-tire-track comparisons, and thus the superior court properly found that expert testimony regarding shoe-print and bike-tire-track comparisons was appropriate.

¶51        The experts testified both at the pretrial hearing and at trial that photographs of the impressions at the crime scene had sufficient detail to draw the limited conclusions to which they testified, thus satisfying Rule 702(b). *See State v. Murray*, 184 Ariz. 9, 30 (1995) (holding that because "[t]here is more than one way in which footprints can be preserved and analyzed," a detective's failure to follow FBI procedures went to the weight of the evidence and not its admissibility). The experts testified that they used standard methods generally accepted in the fields in which they practice; that these methods have been the subject of peer-reviewed journal articles; that training in these methods is provided by their own agencies and under the purview of the International Association for Identification; that testing in the methods is administered annually by Collaborative Testing Service, Inc.; and that the experts' application of these methods to the facts of each case was reviewed and their findings confirmed by another examiner. The evidence thus supported the superior court's finding that the principles and methods of shoe-print and tire-track comparison were reliable, and the expert opinions admissible. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148–49, 153 (1999) (holding that the gatekeeper function applies to all expert testimony, not just testimony based on science, and the court has broad latitude in determining which factors are reasonable measures of reliability in a particular case).

¶52        DeMocker also takes issue with specific testimony from Deputy Sheriff Winslow that the pattern he was tracking near the crime scene was similar to the pattern on DeMocker's bike tire, and testimony that another detective confirmed that the victim's shoes had three N's or three Z's on the sole, similar to the pattern the detective had been tracking near the crime scene.

¶53        Before the first trial, the court precluded the tracking experts from testifying that the shoe prints and tire tracks were similar to those left by DeMocker and the victim. But DeMocker did not raise any objection to the cited testimony at the time it was elicited years later during the second trial before a different judge. When Scott Mascher, another tracking expert, was testifying, defense counsel stated that the superior court had ruled the tracking experts could not testify that the prints were a match, but *could* say

they were similar. Under these circumstances, this court reviews only for fundamental error. *See State v. Lichon*, 163 Ariz. 186, 189 (App. 1989) (holding that a motion in limine failed to preserve issue for appeal in part because the judge who tried the case was not the same judge who granted the motion). And here, the statements from the tracking experts did not result in error, much less fundamental error, because they were admissible under Rule 702.

## VI.     Preclusion of DeMocker's Estates and Trusts Expert.

**¶54**          DeMocker argues that the court violated his due process right to present a complete defense to the fraud schemes charge by precluding his proposed expert witness on trusts and estates. We review a court's decision to preclude expert testimony for an abuse of discretion. *Boyston*, 231 Ariz. at 544, ¶ 14.

**¶55**          The State alleged that pursuant to a scheme to defraud, DeMocker knowingly obtained a benefit (payment of his attorneys' fees) from the victim's trust by means of fraudulent pretenses, misrepresentations, or material omissions. Defense counsel proffered an estates and trusts attorney to (1) testify that a clause in the victim's trust authorizing the trustee to distribute assets for "the health, maintenance, support and education" of the victim's daughters (the beneficiaries) before they reached the age of 25 years old "is standard language in a trust" and "a term of art," and (2) explain "how that [type of term] gets in the trust, why that's in the trust, what that means," and that "he advises his clients when drafting trusts that . . . that standard . . . is a very wide-open standard . . . [t]hat it allows great discretion to the trustee." Defense counsel also offered the expert to testify that "it was his belief and his understanding, from what he reviewed, that everybody involved acted and relied upon the advice of attorneys."

**¶56**          The court precluded the testimony, reasoning that witnesses had already testified that they acted on advice of attorneys, that testimony from an expert that the witnesses did so would constitute argument, and that testimony as to the scope of the trustee's discretion would invade the province of the jury to interpret the facts. The court thereafter provided the jury with detailed instructions on the law governing trusts, as relevant to the fraudulent schemes charge.[6]

---

[6]          After describing at length what the trust authorized, a trustee's fiduciary obligations, and the limits on the trustee's discretion, the court

¶57 The court did not abuse its discretion by precluding the proposed testimony. As noted previously, an expert may testify in the form of an opinion or otherwise in pertinent part if the expert's "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Ariz. R. Evid. 702(a). But an expert is not permitted to testify to legal conclusions. *See Webb v. Omni Block, Inc.*, 216 Ariz. 349, 354–55, ¶¶ 17–20 (App. 2007) (holding that an expert's opinion apportioning percentages of fault to the parties and non-parties "constituted inadmissible legal conclusions under Rule 704 because he thereby told the jury how to decide the case."). Here, the proposed testimony would have been a legal conclusion that the trust clause "allows great discretion to the trustee." *See Webb*, 216 Ariz. at 354, ¶¶ 17–20 (App. 2007). Thus, the testimony would have been improper. Nor did the court abuse its discretion by precluding the expert from testifying about what the clause "means," which was a mixed question of fact and law on which the expert's opinion was superfluous.

¶58 Finally, the court appropriately precluded the expert from testifying that he advises his clients that the standard is "a very wide-open standard" that "allows great discretion to the trustee." First, there was no evidence regarding the trust attorney's specific advice to DeMocker or his daughter. Instead, the only evidence to that effect was a general statement by DeMocker in a jail call in which he stated that withdrawing money from the trust for his defense "is a completely legal and appropriate way that the attorneys have constructed," and his daughter's testimony that she had been told by an attorney representing her as personal representative of the estate that the trust money was hers to do with as she felt appropriate. And any testimony by DeMocker's expert restating DeMocker's statement or that of his daughter would have been cumulative and/or a comment on the evidence. Accordingly, the superior court did not abuse its discretion by precluding this testimony.

¶59 Nor did the court deprive DeMocker of his right to present a defense by precluding this expert witness. Although "the Constitution

---

instructed the jury: "In deciding whether the [victim's trust] was defrauded, one of the issues you must decide is whether the provisions of paragraph 6.2 authorized the two distributions of all the trust assets to [the victim's daughters]. Whether the trustee abused her discretion and/or fiduciary duty does not in and of itself constitute a fraud on the trust as it relates to [the fraudulent schemes count]. The State must still prove beyond a reasonable doubt all the elements of fraudulent schemes and artifices as defined for you with respect to [that count]."

guarantees criminal defendants a meaningful opportunity to present a complete defense," *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citation and internal quotation marks omitted), a defendant's right to present evidence is subject to restriction by application of evidentiary rules that "are not arbitrary or disproportionate to the purposes they are designed to serve." *United States v. Scheffer*, 523 U.S. 303, 308 (1998) (citation and internal quotation marks omitted). A rule of evidence is "unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused." *Id.* DeMocker has not shown that the superior court's ruling precluding this expert witness circumvented this mandate.

## VII. Failure to Give *Willits* Instruction.

**¶60** DeMocker argues that the court erred by not giving an instruction under *State v. Willits*, 96 Ariz. 184 (1964), based on the State's failure to adequately preserve bike-tire tracks and shoe-print evidence and a carpet fragment purportedly showing a bloody handprint. Prior to the first trial, the judge concluded that a *Willits* instruction was appropriate based on the State's failure to adequately preserve shoe-print evidence, and might be appropriate based on the bike-tire track evidence, but the court reserved the right to reconsider the issue after the close of evidence and during settling of jury instructions. We ordinarily review a superior court's refusal to give a *Willits* instruction for abuse of discretion. *State v. Fulminante*, 193 Ariz. 485, 503, ¶ 62 (1999). But because DeMocker did not raise the issue at the second trial, we review for fundamental error only. *See Lichon*, 163 Ariz. at 189.

**¶61** A defendant is entitled to a *Willits* instruction upon a showing that "(1) the state failed to preserve material and reasonably accessible evidence that could have had a tendency to exonerate the accused, and (2) there was resulting prejudice." *State v. Glissendorf*, 235 Ariz. 147, 150, ¶ 8 (2014) (citation omitted). The court did not fundamentally err by failing to give a *Willits* instruction, in light of the evidence demonstrating that the bike-tire tracks and shoe-print evidence were adequately preserved for the State's experts to offer comparative analysis, and it is not clear that what police viewed at most as a bloody "hand swipe" on the carpet would have yielded any evidence having a tendency to exonerate DeMocker. A defendant is not entitled to a *Willits* instruction in a case like this, "merely because a more exhaustive investigation could have been made." *Murray*, 184 Ariz. at 33; *see also* State *v. Willcoxson*, 156 Ariz. 343, 346 (App. 1987) (noting that "failure to pursue every lead or gather every conceivable bit of physical evidence" does not require *Willits* instruction). Nor has DeMocker shown resulting prejudice as a result of any error in failing to give the *Willits*

instruction at the second trial. Accordingly, the court did not commit fundamental error by failing to sua sponte give a *Willits* instruction.

## VIII. Sufficiency of the Evidence of Murder and Burglary.

¶62 DeMocker argues that the evidence was insufficient to support his convictions for burglary and murder. We review de novo the denial of a motion for judgment of acquittal and the sufficiency of the evidence to support a conviction. *State v. West*, 226 Ariz. 559, 562, ¶ 15 (2011*)*. We view the facts in the light most favorable to upholding the jury's verdict of guilt, and resolve all conflicts in the evidence against the defendant. *State v. Girdler*, 138 Ariz. 482, 488 (1983*)*. We leave credibility determinations to the jury. *State v. Williams*, 209 Ariz. 228, 231, ¶ 6 (App. 2004).

¶63 "A conviction may be sustained on circumstantial evidence alone," *State v. Green*, 111 Ariz. 444, 446 (1975), and the substantial circumstantial evidence detailed above supported the convictions. In the month before the murder, DeMocker performed computer searches inquiring about staged suicides and collecting life insurance proceeds after a homicide. He spent considerably more money than he earned, and he repeatedly argued with the victim over money, including the $6,000 in monthly spousal maintenance he had failed to pay the day before the murder. And he maintained a $750,000 life insurance policy on the victim, listing himself as the primary beneficiary.

¶64 On the evening of the murder, DeMocker was on a solitary bike ride (and uncharacteristically not reachable by phone) for more than four hours. Bike-tire tracks and shoe prints made that evening linked him to the crime scene, and the cause of the victim's death was consistent with being struck by an item (golf club) DeMocker had purchased but that had disappeared. And there was evidence that after the crime, DeMocker made elaborate plans to flee. Accordingly, there was substantial evidence from which a jury could convict DeMocker of murder and burglary.

## IX. Denial of Motion for New Trial.

¶65 DeMocker argues that the superior court abused its discretion by denying his motion for new trial. The motion (1) renewed his request to dismiss the case or disqualify YCAO based on the State's alleged misconduct in viewing ex parte, sealed documents, and (2) argued that the alleged misconduct, coupled with the post-conviction misconduct of the jail commander who spoke with DeMocker without an attorney present, required a new trial with prosecution by a different agency. We review the

denial of a motion for new trial for abuse of discretion. *See State v. Larin*, 233 Ariz. 202, 208, ¶ 14 (App. 2013).

¶66　　　　DeMocker asserts that the cited conduct gave rise to an "appearance of impropriety" warranting disqualification of counsel under *Alexander v. Superior Court*, 141 Ariz. 157 (1984). In *Alexander,* the Arizona Supreme Court identified the following factors to be considered in addressing a motion for disqualification based an "appearance of impropriety": (1) whether the motion to disqualify was made for purposes of harassment; (2) whether the party seeking disqualification will be damaged if the motion is not granted; (3) whether there are other alternatives, or whether the proposed solution is the least damaging alternative under the circumstances; and (4) whether the possibility of public suspicion of impropriety outweighs any benefits that might accrue due to continued representation. *Id.* at 165. The burden is on the moving party to show sufficient reason for the disqualification, and "whenever possible the courts should endeavor to reach a solution that is least burdensome upon the client or clients." *Id.* at 161. Moreover, *Alexander* further cautioned that "[o]nly in extreme circumstances" should the opposing party be allowed to interfere with the other party's attorney– client relationship. *Id.* at 161.

¶67　　　　The superior court denied DeMocker's earlier motion to dismiss/disqualify based on the prosecution's viewing of ex parte, sealed documents, expressly finding that it was "obvious that the Clerk of the Court and the OnBase administrator's failures were the proximate cause" of the documents being made available for viewing by the prosecution team. The court found that the prosecution had exhibited "no ill or improper motive in viewing and printing the sealed and *ex parte* documents," which generally related to DeMocker's requests for money to hire experts; "the prosecution made no use of the information in those documents"; "the prosecution's interference with Defendant's right to counsel was not deliberate"; "the State did not benefit in any way from viewing and printing the sealed and *ex parte* documents"; "Defendant has not been directly or indirectly prejudiced"; and "Defendant can receive a fair trial with YCAO as the State's representative."

¶68　　　　As DeMocker acknowledges, this court affirmed that denial on special action review, finding "no clear error in the trial court's findings," and holding that the "ultimate conclusion that Petitioner was not prejudiced by the YCAO's actions is supported by the detailed factual findings of the court." This court accordingly has already rejected DeMocker's argument, and DeMocker has not established a basis to review that ruling, which remains the law of the case. *See Emp'rs Mut. Liab. Ins. Co.*

*of Wis. v. Indus. Comm'n*, 115 Ariz. 439, 441 (App. 1977) (noting that the decision of an appellate court in a case is the law of that case on the points presented throughout all the subsequent proceedings in the case in both the trial and appellate courts).

**¶69**　　　　As to the jail commander's conversation with DeMocker, there was no evidence that the conduct gave rise to an "appearance of impropriety" so extreme that it warranted a new trial with a different prosecuting agency. *See Alexander*, 141 Ariz. at 161. DeMocker testified only that the jail commander interacted with him after the guilty verdict in the second trial and ignored his repeated statements that he was still represented by his attorneys. DeMocker further testified that the jail commander (1) asked him whether he wanted to submit to media interviews (and was not just being pressured by his attorneys to do so); (2) told DeMocker that the distribution of the life insurance proceeds bothered him, the prosecutor, and the sheriff; and (3) told DeMocker that he could help get the life insurance proceeds back from his former attorneys and give them to his daughters. Even accepting DeMocker's testimony at face value, he has failed to show how he was prejudiced by the jail commander's questioning or that a new trial by a different prosecuting agency was required. *See Alexander*, 141 Ariz. at 165 (rejecting disqualification for delay or other tactical reasons absent prejudice to either side). The court accordingly did not abuse its discretion by denying DeMocker's motion for new trial.

**CONCLUSION**

**¶70**　　　　DeMocker's convictions and sentences are affirmed.



AMY M. WOOD • Clerk of the Court
FILED: AA